on this subject because, as I was not at the trial, but we discussed this, when the court asked us for information, we gave you all the information we could find. And Microsoft responded with a very short letter, quote, there is none, close quote. So we didn't give you a ton, I agree, we did not give you a ton, and they said there is none. And the fact is... But they said there is none to support your notion that a shorter time frame would be adequate. Yes, that's exactly right. They certainly didn't need to present us because the district court decided it was a five-month... That's exactly right. Exactly right. I didn't mean to suggest otherwise. The fact is that that issue was not terribly well debated in terms of how much time there was. Because if I recall correctly, I4I said no time, let's have an immediate injunction. Yes, of course. And the court, in its wisdom, decided no, I'm going to give some time. We had a couple of amicus briefs, you will recall, Your Honor, which said more time is needed. If in the wisdom of this panel, I mean, for sure we have very good arguments that an injunction should have been entered, and if the court is interested, I will explain that, but you're asking a different question. Assuming the injunction is sustained, how much plea time should they have? Our point was, they've had plenty of time already from the time infringement was found to make a change, and by the time the court's decision is over, they will have had even more time, and that may be more than enough time for them to make the change. But if in the court's wisdom, the court feels that 60 days is not enough, even from the time you render your decision, then we will defer to whatever reasonable time you conclude. Alternatively, if you otherwise sustain the decision and remand to the district court, you might want to remand with an instruction to the district court to have a brief hearing or briefs exchanged on that issue, and to make a subsequent decision based on that. So... Can I ask one final question, and we'll be done? Of course, go ahead. You have 48 seconds left. And that's on the, and I guess I want to, you know, tap your recollection even, given that we've noted that you were one of the parties in the Reed Corporation. So I'm talking about Reed, and the use of the district court of litigation misconduct as a measure for enhancing damages at $40 million. I guess my two questions are, one, do you think that Seagate undermined, I mean, Reed, as I understand it, tell me if I'm wrong, doesn't allow litigation misconduct to be the be-all and end-all, but it does allow it to be one factor. But I also think one could read Reed as putting limitations on the kind of litigation misconduct we're talking about, because they refer to manipulative litigation strategy, which demonstrates a lack of good faith belief in its defenses. So one, do you agree that you have to meet that criteria to be covered by Reed and to be a permissible factor in enhancement? And two, do you think that Seagate undermined that portion of Reed? I don't think Seagate, I know Reed pretty well, because it was my case, which I fortunately won. I don't think Seagate undermines that factor. The Reed factor, they list, I think, nine factors that the court should consider in determining whether to enhance. So this isn't a question, the jury doesn't end up hearing this, the judge makes the decision. One of the factors is conduct, I don't remember the exact words, you said them, conduct of the party at the litigation. We have a situation here where the district court judge admonished Mr. Powers and said, I suggest, nicely, I suggest you not do that. During the voir dire, certain questions were asked about bankers and trolls and people who don't practice and what have you, and he ended up repeating it, repeating it. And I think that the court under Reed properly took that into consideration. It is expressly listed as one of the factors in Reed, and I think it survives Seagate. I don't think it undermines Seagate at all. Seagate was concerned... Seagate repeatedly emphasizes pre-litigation conduct, and they say, absent some extraordinary circumstances, I read Seagate, the reliance entirely is on the pre-litigation conduct. And doesn't that undermine the notion that this kind of conduct at trial would be relevant to making the determination of willfulness? It doesn't, because the purpose of Seagate was to... You did say Seagate. The purpose of Seagate, willfulness had gotten out of hand. When juries heard bad things about a party, many of them instinctively found willfulness. And I read Seagate emanating from a concurring opinion by Judge Dyke where he cited some attempt to pull back, to put some reins on the willfulness doctrine. That is not the same issue involving enhancement. Enhancement is a judge decision. It's a judge decision based on the totality of circumstances. It includes financial considerations. It includes misconduct. It includes a lot of other things. And I think that all survives. I think the philosophy behind Seagate is very different from the philosophy behind Reed, and therefore, that's my best answer, Your Honor. And I see that I have been a bad predictor. No, that's all right, Mr. Donner. We had a number of questions. Thank you. Thank you. Mr. Powers, you have your rebuttal. Mr. Donner went over by three minutes, so to equal things out, if you need it, you'll have eight minutes for your rebuttal. That should make the time equal on the whole. Thank you, Your Honor. I'd like to begin by responding to Judge Crow's question regarding whether a problem with either the contributory basis or the inducement basis requires reversal or not. This Court's decision in the North Point case and the Spectrum Sports decision from the Supreme Court make quite clear there's a distinction between a flaw in a legal theory that could have supported the verdict in a general verdict context and an alternate factual basis to support a claim. So in North Point, the issue was you had five different possible anticipatory references, but a single claim. The issue was anticipation. And there, the question was, if one of the references didn't work, could the verdict be supported based on one of the other four, and the answer was yes. But Judge Bryson's decision drew a very sharp distinction between that situation and the situation where there are two distinct legal theories to support a general verdict, which is what the District Court did here against Microsoft's request. The Spectrum Sports case from the Supreme Court tells us exactly what should happen in that context, where there was, again, a general verdict that could have been supported by either monopolization or attempt to monopolize. The Supreme Court held that there were illegal infirmities with the attempt to monopolize portion, and therefore reversed the entire verdict because you couldn't tell whether they went under the proper legal theory or the improper legal theory. That law, I think, is clear and unmistakable. This isn't a question of different points of view. That's the law from the Supreme Court in this court. I'd now like to respond to Judge Moore's question about whether there's authority in the absence of a JMOL on damages, whether you can throw out the offending or misguided expert testimony. One of the cases we cited was the in-ray air crash disaster case from the Fifth Circuit, which does, of course, govern—the Fifth Circuit law governs this issue. And I'll quote from that case at 1234, which makes clear it's applying the deferential abuse of discretion standard. In sum, we adhere to the deferential standard overview of decisions regarding the admission of testimony by experts. Nevertheless, we take this occasion to caution that the standard leaves appellate judges with a considerable task. We will turn to that task with a sharp eye, particularly in those instances, hopefully few, where the record makes it evident that the decision to receive expert testimony was simply tossed off to the jury under a let-it-all-in philosophy, which I would submit can be a garbage in, garbage out. Our message to our ABLE trial colleagues, it is time to take hold of expert testimony in federal trials. They then threw it out on exactly the reasons that are similar to what we're talking about. And Daubert itself, of course, provides support for that. Oh, no, I don't—I hope I didn't set you on the wrong course. I don't disagree with you that it's possible for us as an appellate court to say the I think that it could be eliminated despite the absence of a JMAL motion, but the bulk of the case law that was cited to us on 65, 66, and 67 of your brief, wherein you're explaining to us why we ought to, in this case, overturn the jury verdict on damages, all of that pertained, every single one of those cases almost, pertained to a JMAL situation, which is definitely different from an abuse of discretion under Daubert. So, I guess, explain to me why there's an abuse of discretion in Mr. Wagner, if you could, in a very succinct fashion, why Wagner should have been excluded. It was an abuse of discretion not to exclude him. Under that standard, it should have been excluded because he took a 25 percent rule, which in response to Judge Crow's question, I believe itself is improper. It's something that was made up by Mr. Goldscheider, who was a plaintiff's licensing expert, who put it out there in one review to justify what he was doing in his own business, and he based it on Swiss licensing practices of non-technology in the 1950s. The idea that that ought to support a $96 starting point, in this case, which was the starting and ending point of his Georgia-Pacific analysis, effectively, is absurd. But putting that to one side, it is clearly improper, and there's no authority that supports it, to take, to have a benchmark which says, I'm going to take something which doesn't practice the patented invention, where the whole purpose of this exercise is to figure out the value of the patented invention, and all Mr. Dunner's quotes from Microsoft talk about the value of XML. This patent didn't invent XML. It didn't invent XML editing. It's not about any of that. It's about a very, very sub-small slice of that, and the point of this exercise is to determine the value of the patented technology, and what Lucent and other cases from this court teach is that you must, if you're good at whatever benchmark you take, you have to apportion to find the value. If it's Word, you have to apportion to find the value, and exactly the reasons that Your Honor asked the question. If it's XML, you have to. He didn't. He took the full $500 price, despite the admission that there were tons of extra functionalities. But you argued all this to the jury. Why doesn't all this go to the weight? Why does this go to the admissibility? It goes to the admissibility because under GE versus Joyner, which says you have to tie it to the facts, that's the Supreme Court, under Daubert, which says it has to be reliable, it has to be scientifically sound, under Lucent, which says it has to be tied. But the idea of choosing a benchmark and applying a standard royalty rate to that benchmark is not methodologically unsound. That's not what we're saying was unsound. We're saying the manner in which he did that was unsound. That question you just asked would say that you can never challenge Georgia-Pacific analysis because a Georgia-Pacific analysis is appropriate. It's how he did it, and he did it wrong. He did it in an absurd way. He said, here's something which we know is valued at less than $50, but we're going to take a third-party product that doesn't use the patented invention, that has lots of accused functionalities and sells for 10 times that, and we're going to use that unapportioned. And we're going to assume that Microsoft would have started the negotiation by saying, we'll pay you 25% of our profit on that higher-priced product. That's insane. That's just not tied to the facts of the case, which Joyner requires, which Lucent requires, which every decision of this court requires. I'd like to turn to claim construction, if I may. There were two points that I wanted to address. The first is that Mr. Dunner cites number 132 in figure 7 and says that input means, which talks about content and metacodes, shows they can be joined. The input means that column 14, line 18 is a keyboard. It shows nothing about where it's stored. That's a keyboard. It's irrelevant. The second point is, and this is the point your honors asked, the language that's used is permissive. The language actually that's used is, it could be used. Now, an equally fair reading, in fact, I would argue the only reading into this patent, is not that that's permissive, i.e. you could or you could not, but it's establishing a capability of the technology. You can do it with this technology, and without it you can't. That was the whole point of the invention. That's the point of the spec, is that before this you couldn't do it, and that capability is what distinguished this invention from the prior art. And under your honors' decision yesterday, and every other case of this court, where you distinguish the prior art based on a capability that the invention provides that the prior didn't have, that's limiting. In this case, that's independent manipulation throughout the cases. The second point I want to talk about is intent, if I may. Now, Mr. Dunner made two points I'd like to respond to. One is the should-have-known standard. The should-have-known standard has never been applied, ever, to the question of should-have-known of the patent. It's once you have knowledge of the patent and knowledge of an infringement contention, then you can't put your head in the sand. But every decision of this court, from VOTA and every other case in any context, never says you have a duty to investigate, to find the patent contents. All of the cases start from the proposition that once you know those contents and have an accusation of infringement, that that triggers duties. And I think Seagate and the rejection of underwater devices, all of that law is inconsistent with it. Mr. Dunner's argument that Broadcom has a sweeping holding, that absolutely none of the willfulness law applies to inducement scienter, I think reaches too far. All it really decided was that the question of an advice of counsel, opinion, that that could be relevant in the inducement context. That's all Broadcom decided. It did not decide the sweeping issue that Mr. Dunner cites it for. Mr. Dunner's position would take the law of inducement back to negligence, which brought to the record— I think you'll have to wrap up, because I'll let you finish that thought that you're making there, but we do have to bring it to an end. I will. I guess the last point I wanted to make with regard to substantial non-infringing use would be that Mr. Dunner makes arguments why he and the expert think some people may not want to use the accused functionality in a non-infringing way, but the point that he doesn't deny is that two million people disagreed with him. The facts are, according to their own evidence, more people used it in a non-infringing way because they saw benefits in it. So the fact that certain benefits couldn't be obtained using it that way is irrelevant to whether that use is substantial. Two million people, more than those who infringed, even according to their own evidence, used it in that way. There is no way I would submit under this court's law that you can say a situation where more people use it in a non-infringing way, that that's not a substantial non-infringing use. Mr. Powers, thank you. Mr. Dunner, thank you. The case is submitted. That concludes today's argument. All rise.